In the Matter of the Rental Dwelling License held by Mahmood KHAN for the Premises at 3223 Bryant Avenue N., Minneapolis, Minnesota.

No. A10–2211.

Court of Appeals of Minnesota.

Sept. 6, 2011.

Randall Tigue, Randall Tigue Law Office, P.A., Golden Valley, MN, for relator.

Susan L. Segal, Minneapolis City Attorney, Lee C. Wolf, Assistant City Attorney, Minneapolis, MN, for respondent.

Considered and decided by WRIGHT, Presiding Judge; SHUMAKER, Judge; and CONNOLLY, Judge.

## OPINION

SHUMAKER, Judge.

Relator Mahmood Khan challenges respondent City of Minneapolis's procedure for hiring and selecting administrative hearing officers to conduct hearings on alleged violations of city ordinances respecting residential rentals, contending that the hearing officers have a direct, personal, substantial pecuniary interest in rendering decisions favorable to the city and that this procedure violates his due-process rights. Relator also challenges

the revocation of his residential rental license, contending that there is a lack of substantial evidence to support the revocation. Because there is no evidence showing that the city's procedure for hiring and selecting hearing officers provides the hearing officers with a direct, personal, substantial pecuniary interest to decide cases in favor of the city, and because the city's decision to revoke relator's rental license is supported by substantial evidence, we affirm.

## FACTS

Mahmood Khan holds licenses to rent approximately 40 properties that he owns in Minneapolis. One of these properties is a house located at 3223 Bryant Avenue North. There is no dispute that the house contains a legally uninhabitable basement unit.

On March 12, 2009, City of Minneapolis Housing Inspector Valerie Asante conducted a conversion inspection of this property. A conversion inspection is a routine inspection of property that is rented for the first time or that is rented after having been vacant for more than a year. During her inspection, Asante observed violations of the Minneapolis Code of Ordinances, including the illegal occupancy of the basement unit. The tenants told Asante they were using the basement unit as a bedroom, and Asante observed a bed and bedding there. She concluded that the legally uninhabitable basement unit was being used as a bedroom in violation of the code of ordinances, and she entered the violation in the city's database.

Asante also issued an order to Khan to discontinue the unlawful occupancy of the basement unit. The order notified Khan that he was not in compliance with the code and that any additional violations of the code or a failure to comply could result in revocation of his license to rent this particular property. The notice informed Khan that the order was appealable. Khan did not appeal the order. Another housing inspector inspected the property on April 27, 2009, and the basement was no longer occupied.

A little more than a year later, on May 25, 2010, a subsequent group of tenants contacted the City of Minneapolis to report that the property had electrical problems and an unfinished ceiling and kitchen. Housing Inspector Sheila Rawski investigated the complaint. During her inspection, Rawski observed violations of the code, including that the basement unit contained a bed, a mattress, bedding, a dresser, a couch, a chair, a space heater, lighting, and clothes. Rawski concluded that the unit was being illegally occupied as a bedroom. Rawski later learned that this was the second violation on the property for using the legally uninhabitable basement as a bedroom, so she notified Janine Atchison, district manager of the city's Department of Housing Inspections.

Atchison reviewed the evidence and confirmed that this was the property's second citation for illegal occupancy of the basement unit and that Khan had been notified the first time of the illegal occupancy. Atchison began proceedings to revoke Khan's license to rent this particular property, in accordance with the city's policy. Atchison mailed a letter to Khan notifying him of the license-revocation proceedings, and Khan was given 15 days to appeal the determination. Khan timely appealed. A hearing was held before an administrative hearing officer, who heard testimony from and reviewed evidence submitted by both Khan and the city regarding the allegations of illegal occupancy.

Khan testified at the hearing that he did not know the tenants were using the basement as a bedroom on either occasion until he received notice of such from the city.

After receiving notice on both occasions, Khan testified that he evicted the tenants who were living in the basement. Melvin Snoddy, who helps Khan manage his rental properties, corroborated that Khan evicted both groups of tenants after learning they were using the basement illegally. However, Snoddy asserted that Khan was aware of the second instance of illegal use of the basement and that he had already begun eviction proceedings against the tenants prior to Rawski's inspection.

The administrative hearing officer concluded that Khan had twice violated the city's code of ordinances by allowing tenants to use the basement unit as a bedroom. The hearing officer specifically found Khan in violation of Minneapolis, Minn., Code of Ordinances (MCO) § 244.1910(3) (2010), which states that "[n]o rental dwelling or rental dwelling unit shall be over occupied or illegally occupied in violation of [the code]." The hearing officer recommended that the Minneapolis City Council revoke Khan's license to rent this particular property.

The Minneapolis City Council's Regulatory, Energy, and Environment Committee (REEC) considered the recommendation on October 14, 2010, and Khan and the city argued their respective positions. The REEC recommended that the city council adopt the hearing officer's recommendation and revoke Khan's rental license. The city council voted to revoke Khan's rental license on October 22, 2010, and notified him of the decision on November 4, 2010. Khan appealed to this court by petition for a writ of certiorari.

## ISSUES

1. Does the city's administrative-hearing procedure violate Khan's due-process rights because hearing officers are hired and compensated by the city?

2. Was the evidence sufficient to support the city's decision to revoke Khan's rental license?

## ANALYSIS

### Procedural History

The City of Minneapolis's Director of Inspections has authority to initiate an action to revoke a rental license. MCO § 244.1940 (2010). An appeal of the director's recommendation of revocation shall be heard by an administrative hearing officer. MCO § 244.1960(a) (2010). The hearing officer makes a recommendation to the city council, which shall have the final authority to revoke the license. *Id.* (e) (2010). Janine Atchison was acting as the city's director of inspections and initiated revocation proceedings. Khan had a hearing before an administrative hearing officer, who recommended revocation to the city council. The city council heard the matter and voted to revoke Khan's rental license for this particular property.

### Standard of Review

A quasi-judicial decision made by a municipality is reviewable through a writ of certiorari. *See City of Minneapolis v. Meldahl*, 607 N.W.2d 168, 171 (Minn.App. 2000). "A city council's decision may be modified or reversed if the city ... made its decision based on unlawful procedure, acted arbitrarily or capriciously, made an error of law, or lacked substantial evidence in view of the entire record submitted." *Montella v. City of Ottertail*, 633 N.W.2d 86, 88 (Minn.App.2001) (quotation omitted). "The party seeking reversal has the burden of demonstrating error." *Id.*

"If [a municipality] engages in reasoned decisionmaking, the court will affirm, even though it may have reached a different conclusion had it been the factfinder." *Cable Commc'ns Bd. v. Nor–West*

*Cable Commc'ns P'ship,* 356 N.W.2d 658, 669 (Minn.1984). It is not an appellate court's function to resolve conflicting evidence or to assume the role of a city council in weighing policy considerations. *Village of Medford v. Wilson,* 304 Minn. 250, 254, 230 N.W.2d 458, 460 (1975). This court may not substitute its own judgment, retry the facts, or weigh credibility; instead, this court must affirm if there is *"any* legal and substantial basis" to support the decision. *Senior v. City of Edina,* 547 N.W.2d 411, 416 (Minn.App.1996) (emphasis added and citation omitted).

## I.

 Khan argues that the city's procedure for hiring and selecting administrative hearing officers to hear cases such as this violates his due-process rights because the hearing officers are hired and selected by the city and therefore have a direct, personal, substantial pecuniary interest in rendering outcomes favorable to the city and securing future employment. Whether procedural due-process rights have been violated is a question of law, which we review de novo. *Plocher v. Comm'r of Pub. Safety,* 681 N.W.2d 698, 702 (Minn. App.2004).

 The right to due process is guaranteed by the United States and Minnesota Constitutions. U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7. "The threshold requirement of any due-process claim is that the government has deprived a person of a constitutionally protected liberty or property interest...." *Nexus v. Swift,* 785 N.W.2d 771, 779 (Minn.App.2010). If this requirement is met, procedural due process guarantees reasonable notice and a meaningful opportunity to be heard. *Id.* Procedural due process "is flexible and calls for such procedural protections as the particular situation demands." *Brooks v. Comm'r of Pub. Safety,* 584 N.W.2d 15, 19 (Minn.App.1998) (quotation omitted), *review denied* (Minn. Nov. 24, 1998).

 "That officers acting in a judicial or quasi judicial capacity are disqualified by their interest in the controversy to be decided is of course the general rule. Nice questions, however, often arise as to what the degree or nature of the interest must be." *Tumey v. Ohio,* 273 U.S. 510, 522, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) (citations omitted). "[I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." *Id.* at 523, 47 S.Ct. at 441; *see also Buchwald v. Univ. of Minn.,* 573 N.W.2d 723, 727 (Minn.App. 1998) (stating that "[p]arties to an administrative proceeding are entitled to a decision by an unbiased decisionmaker"), *review denied* (Minn. Apr. 14, 1998). The test for determining whether a decisionmaker is unbiased is whether the decisionmaker's situation could tempt "the average man" as a judge to forget the burden of proof required to rule against an alleged violator. *See Tumey,* 273 U.S. at 532, 47 S.Ct. at 444. Ultimately, "[t]here is a presumption of administrative regularity, and the party claiming otherwise has the burden of proving a decision was reached improperly." *Buchwald,* 573 N.W.2d at 727.

The City of Minneapolis contracts with a panel of six hearing officers who perform services for three-year periods. The hearing officers are paid $250 for each half-day of service. The hearing officer in this case rendered services to the city frequently

enough to total $175,000 over three years.[1] Khan contends that this hearing officer's level of compensation creates in him a direct, personal, substantial pecuniary interest to render decisions favorable to the city.

Khan supports his argument with *Haas v. Cnty. of San Bernardino*, 27 Cal.4th 1017, 119 Cal.Rptr.2d 341, 45 P.3d 280 (2002). In *Haas*, the California Supreme Court held that California counties appointing *"temporary* administrative hearing officers must do so in a way that does not create the risk that favorable decisions will be rewarded with future remunerative work." *Id.* at 283 (emphasis added). In *Haas*, the county revoked a massage-parlor owner's license to operate, and a local attorney was appointed as the hearing officer to hear the owner's appeal. *Id.* The hearing officer had not previously served as a hearing officer for the county, had been hired only to hear the matter at hand, and would only be paid for the hearing at hand. *Id.* Further, the county indicated it may use the services of the hearing officer in the future on an ad hoc basis. *Id.* at 284. Haas objected to the hearing officer's appointment and proposed that the county either contract with the state's office of administrative hearings for the services of an administrative law judge or that Haas be given the opportunity to choose and hire the hearing officer. *Id.* at 283. The county rejected both proposals. *Id.*

The facts of *Haas* differ substantially from the facts of the present case. In *Haas*, the county had only one requirement for hiring a hearing officer, namely that the officer be an attorney licensed to practice for at least five years. Here, the city delineates numerous qualifications for eligibility to become a hearing officer in a nine-page document. One of the qualifications the city requires is that a hearing officer understand the obligation to "[f]ind a violation only if the greater weight of the evidence supports such a finding."

Further, when a hearing is scheduled, the city attorney selects a hearing officer from a panel of six attorneys who have contracted with the city for periods of three years. The city allows the alleged violator one automatic right of removal of the assigned hearing officer. A subsequent request for removal will be reviewed by the assigned hearing officer, who will determine whether he should be removed because he is prejudiced against the alleged violator.

The city's hearing officers are contractually obligated to provide services to the city for three years, unlike the hearing officer in *Haas*, who was hired on an ad hoc basis with the potential for future employment. The City of Minneapolis' procedure is similar to a procedure the *Haas* court found acceptable: "[a] county ... might adopt the rule that no [hearing officer] will be eligible for a future appointment until after a predetermined period of time long enough to eliminate any temptation to favor the county." *Id.* at 294, n. 22. Here, the city may not re-hire any of the hearing officers for three years after their initial hiring date. Three years appears long enough to eliminate any temptation to favor the city.

*Haas* also significantly limits its decision to the issue in the case, namely, a hearing officer who was selected on an ad hoc basis

---

1. We take judicial notice of the fact that this hearing officer contracted with the city to be a hearing officer for three years (2008, 2009, and 2010), and was compensated and reimbursed for expenses in the amount of $175,000 over those three years. *See* Minn. R. Evid. 201(b) (stating that judicial notice may be taken of facts readily capable of accurate determination by resort to outside sources).

with the possibility of future work. There, the problem was "the lack of specific statutory standards governing temporary hearing officers appointed by counties." *Id.* The county in *Haas* suffered a fate not shared by the city here, because the city has a clearly defined and detailed hiring and selection process. *Haas*'s limited holding neither controls nor persuades this court.

Khan has the burden to show that the city's procedure violates his due-process rights. He has not done so. Consequently, we follow the United States Supreme Court's direction in *Tumey:*

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

*Tumey,* 273 U.S. at 532, 47 S.Ct. at 444. Kahn has not shown that a three-year contract with the city to provide services as an administrative hearing officer provides a temptation to the average judge to forget the burden of proof and rule in favor of the city. Kahn has offered no factual record from which an inference of hearing officer bias would be plausible but rather he invites us to speculate that bias exists. We decline to do so.

Ultimately, "[t]here is a presumption of administrative regularity." *Buchwald,* 573 N.W.2d at 727. Taking into account this presumption, as well as the city's clearly defined and strictly regulated practice of hiring and selecting hearing officers, the city's procedure does not violate Khan's due-process rights.

## II.

Khan contends the city council had insufficient evidence to revoke his rental license. After Khan's administrative hearing, the hearing officer found that

> [t]he record in this matter is clear that there were two instances where the basement at the property ... was illegally occupied. On both March 12, 2009, and May 25, 2010, housing inspectors observed the basement room being used as a bedroom and that the room did not have the required egress windows to be used as a habitable room.

The hearing officer then concluded that Khan, as the owner of the property, had violated MCO § 244.1910(3), which states that "[n]o rental dwelling or rental dwelling unit shall be over occupied or illegally occupied in violation of the [code]." Khan contends the evidence does not support the hearing officer's finding that his property was illegally occupied in violation of the code. Khan cites MCO § 244.400 (2010), which states that "[n]o person shall occupy ... or let or allow another to occupy any building or structure for the purpose of living therein, which does not comply with the requirements set forth in [the code]." Khan contends he did not violate this provision of the code because he never "allowed" his tenants to use the basement as a bedroom. He maintains that absent this finding, representing a material element of the case against him, the city council's revocation of his rental license must be reversed.

The record shows that on March 12, 2009, Housing Inspector Asante conducted a routine conversion inspection of Khan's rental property, during which she observed a bed and bedding in the legally uninhabitable basement unit. The tenants told Asante they were using the basement as a bedroom. Observing that the unit lacked egress windows and other features required for legally habitable basements, Asante concluded the basement was being illegally occupied. The city issued an or-

der notifying Khan that he was in violation of MCO § 244.1910(3) and ordering him to abate the illegal use of the basement unit. The order also informed him that any further violation could result in the revocation of his license to rent this particular property. The record indicates that after learning of the illegal occupancy, he evicted the tenants. He did not appeal the order.

One year later, on May 25, 2010, Housing Inspector Rawski investigated the property after another group of tenants complained that the property had electrical issues and an unfinished kitchen and ceiling. During her inspection, Rawski observed a bed, bedding, a dresser, a couch, a chair, a space heater, lighting, and clothes in the basement unit and concluded that the basement was being illegally occupied. As this was Khan's second violation of MCO § 244.1910(3), the city notified him it was beginning license-revocation proceedings. Khan appealed the order and had a hearing before an administrative hearing officer.

At the hearing, Khan gave conflicting testimony regarding this second instance of alleged illegal occupancy. He testified on direct examination that he was unaware of the illegal use of the basement until he received notice from the city that it was beginning license-revocation proceedings. However, on cross-examination, he testified that he knew the tenants were using the basement as a bedroom and that he evicted them when he discovered this. Khan filed an eviction complaint against the tenants on May 7, 2010, two-and-a-half weeks prior to Rawski's inspection.

Khan's property manager, Melvin Snoddy, testified that he had also observed the illegal use of the basement as a bedroom on one of his visits to the property prior to Rawski's inspection and that he had instructed the tenants to remove the proper-ty from the basement or else Khan would evict them. Snoddy testified that they did not remove the property from the basement so Khan began eviction proceedings. Snoddy also testified he had "heard" that the tenants then retaliated against Khan for filing an eviction complaint by calling the city to report they were illegally inhabiting the basement unit.

However, whether the tenants had been evicted and had removed their property from the basement by the time Rawski inspected the property on May 25 is unclear. Rawski testified that a woman named "Christy" let her into the property for inspection; however, the city's RFS History Report reflects that a housing inspector was allowed entry to the property on June 1, 2010, by one of the tenants, indicating that the tenants had not moved from the property by June 1.

However, Rawski testified that the complaint she received from the tenants was not that they were living in the basement unit (which would support Khan's claim of retaliation) but that the property had electrical issues and an unfinished kitchen and ceiling. Rawski did not discover the illegal use of the basement until her inspection, which was precipitated by alleged code violations other than illegal occupancy. Further, in his complaint, Kahn alleged that the basis for the eviction was that the tenants owed him $2,122 in unpaid rent, and not that they were in violation of the code of ordinances for using the basement as a bedroom.

Ultimately, this issue is one of credibility. The hearing officer found that Khan's submission of his eviction action against the tenants at the property shows that [Khan] only brought the action to recover unpaid rent . . . and does not address the tenants using the basement as a bedroom. [Khan] also testified that he did not know of the illegal occupancy

until he received the notice from the Department, from an inspection that occurred on May 25, 2010, while [Khan] had filed the eviction action in early May and had a settlement agreement in place with the tenant on May 21, 2010, before the inspection even occurred.

Further, the hearing officer found that neither Khan nor Snoddy visited the property very often and would not have known whether a tenant was living in the basement. Khan admitted this fact at the hearing, stating that he visits all of his properties only once a month, and then only to collect rent. Snoddy testified that he only visits properties when a tenant complains and that he was unaware that the first set of tenants was living in the basement prior to Asante's inspection. Khan also testified that he tells his tenants that if they violate the city's code, they, rather than he, are the ones to receive a citation if an inspector observes the violation. The hearing officer found the testimony and evidence presented by the city to be more persuasive and credible than that presented by Khan. The hearing officer's finding is supported by the record.

Khan was charged with twice violating MCO § 244.1910(3), which prohibits property from being illegally occupied. Khan does not dispute that (1) he owns this property, (2) the property includes a legally uninhabitable basement unit, and (3) tenants were illegally inhabiting this basement unit. Consequently, the hearing officer had sufficient evidence to determine that Khan had twice violated MCO § 244.1910(3) and to recommend that Khan's rental license be revoked.

■■■ "The functions of factfinding, resolving conflicts in the testimony, and determining the weight to be given to it and the inferences to be drawn therefrom rest with the administrative board." *Quinn Distrib. Co. v. Quast Transfer, Inc.,*

288 Minn. 442, 448, 181 N.W.2d 696, 700 (1970) (quotation omitted). The hearing officer had substantial evidence to find the city's evidence more credible than Khan's testimony and evidence and to recommend revocation. There was "a rational connection between the facts found and the choice made"; so the hearing officer's recommendation and the city council's subsequent decision were not arbitrary and capricious. *See In re Excess Surplus Status of Blue Cross and Blue Shield of Minn.,* 624 N.W.2d 264, 277 (Minn.2001) (quotation omitted). "Routine municipal decisions should be set aside only in those rare instances where the decision lacks any rational basis, and a reviewing court must exercise restraint and defer to the city's decision." *City of Mankato v. Mahoney,* 542 N.W.2d 689, 692 (Minn.App.1996). Considering the substantial evidence supporting the city council's decision, we defer to the decision to revoke Khan's rental license for this property.

*Absurd Result*

■■■ Khan argues that requiring him to comply with the code of ordinances when his tenants have control of the property and he has legally limited access to it during their tenancy is absurd, because a tenant could use the property illegally without Khan's knowledge. "No person shall ... let or allow another to occupy any building or structure for the purpose of living therein, which does not comply with the requirements set forth in [the code]." MCO § 244.400. Khan contends he did not allow his tenants to use the basement unit illegally and that he thus did not violate this provision of the code.

■■■ "When reviewing a [law], this court assumes that the [lawmaking body] does not intend absurd or unreasonable results." *In re Kleven,* 736 N.W.2d 707, 709 (Minn.App.2007). Khan contends it is

absurd to hold him accountable for his tenants' violations of the code when his tenants are legally protected from frequent intrusion to ensure they are in compliance with the code. However, it would be an equally absurd result to allow a landlord to plead ignorance of tenants' actions and therefore avoid any responsibility for their violations. Adherence to the code is one of the responsibilities inherent in owning property and leasing it to others. *See* MCO § 244.1910 (stating that a landlord must adhere to a number of rules in order to hold a rental license and to avoid revocation of that license, including ensuring that property is not illegally occupied). Further, it is Khan, not a tenant, who is legally bound to the city to ensure that property is not used illegally, and it is Khan's responsibility to ensure his tenants understand they cannot use the premises illegally.

*Statutory Interpretation*

 Khan further contends that the directive of MCO § 244.400 not to "*let* or allow another to occupy*" any unit not in compliance with the code should be interpreted to require "a knowing act of permission on the part of [Khan]." Khan's argument presents a question of interpretation of an ordinance. The interpretation and application of a city ordinance is a question of law, which we review de novo. *Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn. 1980). The party attacking the validity of an ordinance has the burden of proof. *State v. Perry,* 269 Minn. 204, 206, 130 N.W.2d 343, 345 (1964).

 The rules governing statutory interpretation are applicable to the interpretation of city ordinances. *Yeh v. Cnty. of Cass,* 696 N.W.2d 115, 128 (Minn.App. 2005), *review denied* (Minn. Aug. 16, 2005). The object of statutory interpretation "is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2010). When interpreting a law, we "first assess[ ] whether the [ordinance's] language, on its face, is clear or ambiguous." *Laase v. 2007 Chevrolet Tahoe,* 776 N.W.2d 431, 434 (Minn.2009) (quotation omitted). We "construe words and phrases according to their plain and ordinary meaning." *Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). A law is read as a whole, and each section is interpreted "in light of the surrounding sections to avoid conflicting interpretations." *Id.* Whenever possible, "[e]very law shall be construed ... to give effect to all its provisions." Minn.Stat. § 645.16.

Khan contends that the word "let" should be read to require a showing that he knowingly permitted a tenant to inhabit the property illegally. He further contends that he did not "let" his tenants inhabit the basement unit and thus he has not violated this provision of the ordinance.

 This court must interpret a statute, "whenever possible, to give effect to all of its provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Kleven,* 736 N.W.2d at 709 (quotations omitted). In giving effect to all of the ordinance's provisions, we come to the inevitable conclusion that "let" cannot mean what Khan contends it should mean, because "let" would essentially have the same meaning as "allow," and would create redundancy. Instead, "let" must be attributed with its common usage. *See Amundson v. State,* 714 N.W.2d 715, 720 (Minn.App.2006) (stating that courts should construe a word according to its ordinary meaning, unless the legislature has provided a specific definition), *review denied* (Minn. Aug. 15, 2006). To "let" is to "grant the temporary possession and use of [ ]land ... to another in return for rent or other consider-

ation." Bryan A. Garner, *A Dictionary of Modern Legal Usage,* 514 (2d ed.1995). "Let" can also mean "[t]o offer (property) for lease; to rent out." *Black's Law Dictionary,* 986 (9th ed.2009). Khan's proposed interpretation is thus rejected, and we hold that MCO § 244.400 prohibits landlords from letting (in other words, leasing) a unit, or from allowing tenants to occupy a unit, if that unit does not comply with the code of ordinances.

*Unfair Revocation Proceedings*

Khan briefly argues on appeal that the city's policy of invoking revocation proceedings after two violations of the same provision of the code has no time limit and is unfairly left to the discretion of the housing inspection department. He contends that 15 months after the first violation of MCO § 244.1910(3) was too long a time to punish him for a second violation. The hearing officer found that prior to 2004, the city council had imposed a time limit on punishing second violations of the same provision of the code, but that in 2004, the city council amended the ordinance to eliminate the time limit.

Janine Atchison testified at the hearing regarding this issue. Atchison testified that the purpose of the 2004 amendment to the ordinance was to stop the common practice of landlords initially complying with orders to cease illegal occupancy but later resuming the illegal occupancy with no consequence. Atchison testified that the city council voted to amend the ordinance so there was no time limit between first and second violations in order to enable the department to revoke rental licenses of landlords who continued to allow illegal occupancy. Atchison further testified that the department subsequently adopted an "in-house" policy of forgoing revocation proceedings if there is more than a five-year lapse between the first

and second violations of the same provision of the code. The city's policy appears to be reasonable and fair and properly designed to discourage repeated violations of housing ordinances through taking advantage of the city's limited means to conduct frequent inspections.

Khan offers no legal analysis or citation for his argument. An assignment of error in a brief based on mere assertion and not supported by argument or authority is waived unless prejudicial error is obvious on mere inspection. *State v. Modern Recycling, Inc.,* 558 N.W.2d 770, 772 (Minn.App.1997); *see also Ganguli v. Univ. of Minn.,* 512 N.W.2d 918, 919–20 n. 1 (Minn.App.1994). We find no obvious prejudicial error here. Without a record showing that this policy is one with which landlords have difficulty complying, or that the department exercises its discretion in an arbitrary or prejudicial manner, we cannot meaningfully address this issue.

## DECISION

Because there is no evidence that the city's procedure of hiring and selecting hearing officers to preside over residential rental-license-revocation cases creates a direct, personal, substantial pecuniary interest in the hearing officer to render outcomes favorable to the city, a landlord's due-process rights are not violated when hearing officers are hired and selected by the city in this manner. Further, the city council's decision was supported by substantial evidence in the record.

**Affirmed.**